IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Personal Restraint of: )      No. 82256-0
                                              )
                                              )      DIVISION ONE
JERRY BRAND BOGART                            )
                                              )      UNPUBLISHED OPINION
                            Petitioner.       )
                                              )
                                              )

     ANDRUS, A.C.J. —   In this personal restraint petition, Jerry Bogart seeks relief from his convictions for first degree assault with a deadly weapon and unlawful possession of a firearm.  He challenges both the legal and evidentiary basis for his convictions as well as the adequacy of his trial and appellate counsel's representations.  We deny his personal restraint petition.

### FACTS[1]

     Kelly LeMoigne and his wife, Vicki Ecklund, were long-time users of methamphetamine.  They bought drugs from James Stevens and, at some point in 2015 or early 2016, both Ecklund and LeMoigne provided information to the police about Stevens, resulting in his arrest.

---

[1] The State moved to transfer the Verbatim Report of Proceedings (VRPs) from the direct appeal in this case, No. 78057-3-1, for our consideration of this petition, which this court granted.  At trial, Kelly LeMoigne's perpetuation deposition was admitted in lieu of live testimony.  Because this testimony was not transcribed in the VRPs and is necessary for our full consideration of all of the issues here, including whether the evidence was sufficient to convict, we have transferred the Clerk's Papers, which contain a transcript of LeMoigne's deposition, on our own motion.

LeMoigne and Ecklund also purchased methamphetamine from Bogart, Stevens' friend, on several occasions. In the early morning hours of March 23, 2016, LeMoigne arranged to meet Bogart in order to buy methamphetamine. Unbeknownst to LeMoigne, Bogart planned to confront him about being a police informant and decided not to sell him any drugs. Bogart, who testified at trial, described himself as "[h]omicidely" angry that Ecklund and LeMoigne "were rats."

When LeMoigne arrived at the meeting place, Bogart was already there, standing in front of his car. LeMoigne parked his car facing Bogart. When Bogart approached LeMoigne's window, LeMoigne handed Bogart money and Bogart tossed a cigarette pack containing salt, rather than methamphetamine, into the car.

Bogart then reached through the open car window, punched LeMoigne in the face, and called him a "f—ckin' rat." LeMoigne saw Bogart preparing to hit him again and, afraid of being hit, drove his car forward, intentionally striking Bogart's car and damaging both vehicles. Bogart pulled out a handgun and fired several shots at LeMoigne as he drove away. Bogart claimed he acted in self-defense because he was afraid LeMoigne intended to hit him with his car.

As LeMoigne was driving home, he received a voicemail message from Bogart in which Bogart expressed concern for LeMoigne and asked where he had gone. Bogart, believing he had terminated the call to LeMoigne, told his girlfriend that he had tried to kill LeMoigne and that he would kill him if he saw him again. His comments were recorded on LeMoigne's voicemail.

LeMoigne reported the shooting incident to the police later that morning. Bogart was subsequently stopped and arrested. When police executed a search

warrant on Bogart's car, they found two guns—a .22 caliber pistol and a 12-guage shotgun—and ammunition for both weapons.

The State charged Bogart with first degree assault with a firearm and two counts of first degree unlawful possession of a firearm. While awaiting trial, Bogart shared a jail cell with Tyler Vorderstrasse. Vorderstrasse, who had known Bogart for several years and with whom he shared many mutual friends, was also friends with LeMoigne and Ecklund.

While they were cellmates, Bogart and Vorderstrasse discussed the details of their respective cases. Vorderstrasse then testified at trial about these conversations in exchange for a reduction in a pending charge against him. Vorderstrasse testified that Bogart told him he had punched LeMoigne and called him a "rat" because he believed LeMoigne and Ecklund had informed on Stevens. Vorderstrasse also testified that Bogart admitted he had fired shots at LeMoigne, hitting LeMoigne's car in the process.

The jury found Bogart guilty of first degree assault with a deadly weapon and both counts of unlawful possession of a firearm.[2] The trial court sentenced Bogart to 318 months on the assault, with a 60-month firearm enhancement, to be served consecutively to a 72-month sentence on a bail jumping conviction, for a total period of confinement of 479.5 months.

Bogart appealed and this court affirmed his conviction in State v. Bogart, No. 78057-3-I, slip. op. (Wash. Ct. App. Sept. 16, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/780573.pdf. The court reversed his

_____

[2] At a subsequent bench trial under the same cause number, Bogart was also found guilty of one count of bail jumping.

sentence, however, because the trial court had imposed a firearm enhancement when the jury's special verdict only found that he had used a deadly weapon. We remanded the case for resentencing to reflect the correct sentencing enhancement. Id. In August 2020, the trial court resentenced Bogart to 318 months on the assault, with a 24-month deadly weapons enhancement. The sentences for unlawful possession of firearms and bail jumping remained the same. Bogart's current total period of confinement is 443.5 months.

In this timely personal restraint petition, Bogart argues that (1) the trial court erred in admitting ER 404(b) evidence relating to his attempts to sell firearms to a third party; (2) the trial court erred in denying his motion to compel information about the confidential informant activities of LeMoigne and Ecklund; (3) he was denied a full and fair opportunity to prepare for trial; (4) the evidence is insufficient to sustain his conviction for first degree assault with a deadly weapon; (5) he received ineffective assistance of counsel at trial and (6) on appeal; and (7) the cumulative effect of the errors denied him a fair trial. We reject each and every claim.

## ANALYSIS

An appellate court may grant relief to a petitioner who is under restraint and who can demonstrate his restraint is unlawful. RAP 16.4; In re Pers. Restraint of Cook, 114 Wn.2d 802, 805, 792 P.2d 506 (1990). Restraint is unlawful when a conviction is obtained in violation of the United States Constitution or the laws of the state of Washington. RAP 16.4(c)(2).

Relief by way of a collateral challenge to a conviction is extraordinary and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). The petitioner has the burden of demonstrating error and, if the error is constitutional, actual and substantial prejudice. In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 821, 408 P.3d 675 (2018). If the error is not constitutional, the petitioner must show that the error represents a fundamental defect that inherently resulted in a complete miscarriage of justice. Id. (quoting In re Pers. Restraint of Finstad, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)).[3] The petitioner must make these heightened showings by a preponderance of the evidence. In re Pers. Restraint of Yates. 177 Wn.2d 1, 17, 296 P.3d 872 (2013).

A. ER 404(b)

Bogart first argues that the trial court admitted evidence in violation of ER 404(b) when it allowed testimony that he arranged to sell a shotgun to a third party. ER 404(b) prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Before admitting evidence pursuant to ER 404(b), the trial court must

---

[3] Bogart cites In re Pers. Restraint of Pierce, 173 Wn.2d 372, 377, 268 P.3d 907 (2011) for the proposition that "when a petition 'raises issues that were afforded no previous opportunity for judicial review, . . . the petitioner need not make the threshold showing of actual prejudice or complete miscarriage of justice.'" This proposition does not apply to most of the claims he raises here. This lower burden of proof applies to issues that have seen no opportunity for a prior appeal, such as when a petitioner challenges prison policies or disciplinary decisions. See Pierce, 173 Wn.2d at 375 (review concerned money that had been taken from an inmate's account after he was incarcerated); In re Pers. Restraint of Dalluge, 162 Wn.2d 814, 817, 177 P.3d 675 (2008) (lower standard applied because there is no direct review of department of corrections hearing finding that petitioner violated his community custody conditions). By contrast, with the exception of Bogart's claim that he received ineffective assistance of appellate counsel, the legal and evidentiary claims raised here had an opportunity for judicial review on direct appeal.

(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). If the evidence is admitted, a limiting instruction is required. State v. Arredondo, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

When the admissibility of evidence is challenged under ER 404(b), we review a trial court's ruling for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). Erroneous admission of ER 404(b) evidence is not of constitutional magnitude. State v. Mezquia, 129 Wn. App. 118, 131, 118 P.3d 378 (2005). As such, Bogart bears the burden of demonstrating that any error by the trial court here resulted in a complete miscarriage of justice. Sandoval, 189 Wn.2d at 821.

Here, Vorderstrasse testified that, while awaiting trial in the Snohomish County Jail, Bogart told him that the morning after the incident with LeMoigne, he made plans to sell a shotgun to a man named "Bald Billy." Bogart objected to this testimony, arguing it was inadmissible evidence of a prior bad act that was cumulative of evidence already presented. The State argued that this evidence demonstrated Bogart's possession of the firearm, an element of one of the charged offenses. It also argued that because Bogart claimed Vorderstrasse knew details of the alleged shooting incident only from reading Bogart's discovery materials in their shared jail cell and not from inculpatory statements from Bogart himself, the

evidence that Vorderstrasse knew about the impending sale to Bald Billy was necessary to corroborate Vorderstrasse's testimony that he gained his knowledge of the shooting incident from Bogart directly and not from discovery materials. The court admitted the evidence and instructed the jury that the testimony relating to the sale of the shotgun could be considered only for the purpose of evaluating the credibility of witnesses.

Bogart argues that testimony related to the sale of the shotgun was irrelevant because there was no evidence suggesting that the shotgun he tried to sell to Bald Billy was the shotgun the police found in the vehicle.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Here, this evidence was relevant to the jury's determination of Vorderstrasse's credibility.

In his opening, Bogart raised the issue of Vorderstrasse's credibility. He told the jury that "the information [Vorderstrasse] knows did not come from [Bogart], it came from reading material of [Bogart's], what we call discovery," which he would have had access to in the cell he shared with Bogart. He referred to Vorderstrasse as "a career criminal who when caught provides information to law enforcement to get lighter sentences . . . . [H]e lies for a profession."

Evidence of Bogart's attempted sale of the shotgun, however, was only accessible through use of a computer, and Vorderstrasse could not have read about it in their shared jail cell. This evidence rebutted Bogart's challenge to Vorderstrasse's credibility by demonstrating that Vorderstrasse had details that

could not have been discovered by merely reading case documents found in Bogart's cell. See State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017) ("Credibility evidence is particularly relevant when the witness is central to the prosecution's case.").

Moreover, evidence that Bogart intended to sell the shotgun was circumstantial evidence demonstrating Bogart's dominion and control over the weapon, which spoke to whether Bogart unlawfully possessed the firearm. Evidence regarding the possession of a weapon is admissible and highly relevant where the jury could infer from the evidence that the weapon could have been used in the commission of the crime. State v. Luvene, 127 Wn.2d 690, 708, 903 P.2d 960 (1995).

Bogart maintains that, because detectives testified that the shotgun was found in Bogart's car, evidence that he tried to sell a shotgun to a third party was cumulative of the evidence that he possessed a firearm and was unduly prejudicial in implying that he was guilty of improperly attempting the sell a weapon. But the evidence was not cumulative with respect to Vorderstrasse's credibility, who, Bogart acknowledges, was a "star witness" the State used to elicit admissions in Bogart's own words. Further, during Bogart's own direct testimony, he admitted that he tried to sell the revolver he used in the assault to LeMoigne just weeks before the incident. Given this admission, Bogart cannot demonstrate any prejudice resulting from testimony regarding the sale of a firearm.

Even if the trial court erred in admitting evidence that Bogart tried to sell a shotgun to a third party, Bogart cannot demonstrate that he is entitled to relief. This purported error did not result in a complete miscarriage of justice.

B. Motion to Compel

Bogart next argues that the trial court abused its discretion when it denied his motion to compel historical information about LeMoigne and Ecklund.[4] We disagree.

Prior to trial, Bogart moved to compel the disclosure of historical information relating to LeMoigne and Ecklund. He argued that any information these witnesses may have shared with law enforcement could be used to impeach them or attack their credibility. The trial court granted the motion in part by issuing a subpoena duces tecum to the Snohomish County Regional Drug Task Force directing it to produce documents relating to either witness within the last ten years for an in camera review. The court received three separate batches of responsive documents from the task force. Following its review of these documents, the court ruled that disclosure of the materials was not required. The court found that

> [The materials] do not contain information about Mr. Bogart. They confirm Ms. Ecklund's participation as a paid informant over a period of time. Other than the potential impeachment value of the fact that Ms. Ecklund has been a paid informant, a fact that the defense knows because Ms. Ecklund disclosed it through discovery in this case, the documents are not relevant for other impeachment purposes or for any direct evidence purpose that relates to Mr. Bogart's current charges.

---

[4] Bogart also asserts that the court erred in denying the same motion with regard to Vorderstrasse. The record, however, demonstrates that Bogart withdrew the motion as to Vorderstrasse.

The court further found that the documents were silent as to LeMoigne. The court marked the documents it had reviewed as Exhibit 1 and ordered that they be filed under seal.

Bogart argues that the documents he requested were discoverable under CrR 4.7 because he could have used them to impeach witnesses whose credibility was "pivotal" in this case. CrR 4.7(e)(1) provides that "[u]pon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court in its discretion may require disclosure to the defendant of [other] relevant material and information." Both threshold requirements—materiality and reasonableness—must be met before the court may exercise discretion in granting the request. State v. Norby, 122 Wn.2d 258, 266, 858 P.2d 210 (1993). In general, we review discovery decisions based on CrR 4.7 for abuse of discretion. State v. Vance, 184 Wn. App. 902, 911, 339 P.3d 245 (2014).

Without challenging the trial court's finding that the materials contained no impeachment or direct evidence, Bogart now argues that these documents were material. He seems to argue that the documents must be material because the witnesses' history of providing evidence to gain advantage with law enforcement affects their credibility. But the jury heard evidence that Ecklund worked as an informant and heard Bogart's arguments that this damaged her credibility. And Bogart fails to identify how the specific details of these documents were material. Moreover, he has not designated the sealed materials for our review. Thus, we do not have the record necessary to determine whether the trial court abused its

discretion in finding that the documents contained no impeachment or direct evidence relating to Bogart or in concluding that the documents were not material.

C.  Access to Resources and Time to Prepare

Bogart argues that he was denied his constitutional right to a fair trial because the State denied him adequate access to the discovery in his case and time to prepare.  The record does not support this argument.

The Fourteenth Amendment to the United States Constitution requires that criminal prosecutions conform to prevailing notions of fundamental fairness, and that criminal defendants be given a meaningful opportunity to present a complete defense.  State v. Wittenbarger, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994) (citing California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct 2528 81 L. Ed. 2d 413 (1984).  In Washington, CrR 4.7 governs discovery in criminal cases.  It details the obligations of both the prosecution and defense in disclosing information within their respective possession or control and dictates, generally, what information is subject to disclosure.   The principles underlying this rule "require meaningful access to copies based on fairness and the right to adequate representation." State v. Boyd, 160 Wn.2d 424, 433, 158 P.3d 54 (2007).

> In order to provide adequate information for informed pleas, expedite trials, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protections of persons, effective law enforcement, the adversary system, and national security.

State v. Yates, 111 Wn.2d 793, 797, 765 P.2d 291 (1988) (quoting CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE 77 (West

Pub'g Co. ed.1971)).  "To deny access to copies does not accord with these policies."  Boyd, 160 Wn.2d at 434.

Bogart asserts that, while in jail, he was not given access to the entirety of the discovery available in his case, which infringed on his right to meaningfully participate in his defense.  But Bogart's counsel informed the court that Bogart had received all of his discovery, but one document.  And Patricia Pendry, the recording and data management supervisor at the Snohomish County Jail, testified about the discovery policies for all inmates.  According to Pendry, inmate discovery is limited to paper documents, which they must keep in their cell in a "bin box."  While the inmates are not subject to any page limit for the amount of paperwork they can keep in their cell, they are required to keep it within their bin box, which is approximately 17" long by 12" wide by 10" deep.  Inmates who are represented by counsel can request an additional bin box.

Bogart argues that this system limited the volume of legal paperwork he had access to, requiring him to review discovery in a piecemeal fashion.  He contends this piecemeal production limited his ability to go back to read in context documents the State produced early in his case when he received new documents that referenced the earlier produced material.

Bogart cites no law supporting the contention that either the right to a fair trial or the right to present a defense grants a criminal defendant the right to unlimited access to discovery materials.  In fact, under federal law, sensitive materials need only be made "reasonably available" to the defendant.  See 18 U.S.C. § 3509(m)(2)(A) ("a court shall deny, in any criminal proceeding, any

request by the defendant to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography . . .<u>so long as the Government makes the property or material reasonably available to the defendant</u>.") (emphasis added).

Moreover, he has not articulated how the limited access to discovery infringed his rights. Bogart's attorney had unrestricted access to all the discoverable materials and was able to craft and present a defense. Even if we assume that piecemeal production to a defendant amounts to a constitutional violation, Bogart has not identified any actual or substantial prejudice to the development of his case nor has he identified how it affected the verdict.

D. <u>Sufficiency of the Evidence</u>

Bogart next challenges the sufficiency of the evidence supporting his conviction for first degree assault with a deadly weapon, arguing there was insufficient evidence of his intent to inflict great bodily harm on LeMoigne. We disagree.

Due process requires that the State prove each element of a charged offense beyond a reasonable doubt. <u>State v. Chacon</u>, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). We review the sufficiency of the evidence de novo. <u>State v. Rich</u>, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. <u>State v. Elmi</u>, 166 Wn.2d 209, 214, 207 P.3d 439 (2009). A defendant's claim of insufficiency "admits the truth of the State's evidence and all inferences that

reasonably can be drawn" from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Under RCW 9A.36.011(1)(a), a person is guilty of assault in the first degree if that person assaults another with a firearm or any deadly weapon with intent to inflict great bodily harm. A person acts with "intent" if he "acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). The State is entitled to rely on circumstantial evidence in proving the defendant's intent. State v. Mancilla, 197 Wn. App. 631, 649, 391 P.3d 507 (2017).

Viewing the evidence in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that Bogart intended to cause great bodily harm to LeMoigne. Bogart admitted that he was he was "[h]omicidely" angry when he discovered that LeMoigne and Ecklund provided information to the police. Bogart admitted that he arranged a meeting with LeMoigne where he planned to sell him fake drugs and confront him about being an informant. Bogart admitted that he punched LeMoigne in the face and called him a rat. LeMoigne testified Bogart pulled a gun from his pocket and shot at LeMoigne and his car. Bogart admitted that "Well, so I started shooting. Jesus, man, okay. I started shooting pop, pop, pop, pop." After the incident, Bogart left a recording on LeMoigne's voicemail in which he can be heard saying that he had just tried to kill LeMoigne and that he was going to kill LeMoigne the next time he saw him. Bogart admitted that it is his voice in the recording, and the recording was played for the jury at trial.

Bogart argues now, as he did to the jury, that the evidence only demonstrates that he shot at LeMoigne in self-defense. But his admitted rage

- 14 -

towards LeMoigne for being an informant and the voicemail left shortly after the incident undercuts the contention that he was acting only in self-defense. And the jury, having been presented with evidence, was entitled to reject Bogart's version of events. We defer to the jury's evaluation of witness credibility, resolution of testimony in conflict, and weight and persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

The evidence was sufficient to support Bogart's conviction.

E.  Ineffective Assistance of Trial Counsel

Next, Bogart asserts that his trial counsel was ineffective for four reasons: (1) his counsel did not withdraw despite a breakdown in their relationship; (2) his counsel failed to properly advise him on a plea offered by the State; (3) his counsel's closing arguments urged the jury to convict Bogart; and (4) his counsel failed to challenge evidence that he shot at LeMoigne and caused bullet damage to his car. We reject each in turn.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's representation resulted in prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have

been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Because the defendant must show both prongs, a failure to demonstrate either prong will end the inquiry. State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Deficient performance occurs when counsel's performance cannot be attributed to any conceivable legitimate tactic. State v. Carson, 184 Wn.2d 207, 218, 357 P.3d 1064 (2015) (quoting Grier, 171 Wn.2d at 33). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). There is a strong presumption that counsel exercised reasonable professional judgment to render adequate assistance. Carson, 184 Wn.2d at 216. To rebut this presumption, the defendant has the burden to establish that there are no legitimate strategic or tactical reasons explaining counsel's performance. McFarland, 127 Wn.2d at 335-36.

Complete Breakdown in Communication

Bogart first contends his trial counsel, Jason Schwarz, should have withdrawn from the case because they had "serious and continuous problems." Bogart submitted a declaration contending that Schwarz did not provide him with discovery in his case, that Schwarz did not respond to Bogart's correspondence and questions, that Schwarz told Bogart that he was a "pain in the ass" and that no other attorney's wanted to work with Bogart, and that Schwarz discussed Bogart's case with another inmate.

Bogart proposes no legal framework with which to analyze his argument that counsel should have withdrawn and he cites no authority for the contention that his counsel had a duty to withdraw. Even if we were to assume that his attorney had a duty to withdraw from representation, Bogart must demonstrate that Schwarz would have been permitted to withdraw had he requested to do so.

A defendant "'must show good cause'" before the trial court will allow substitution of counsel, "'such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'"[5] State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (quoting State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (Stenson I). If the relationship between a defendant and his counsel completely collapses, the denial of substitute counsel violates the defendant's right to effective assistance of counsel. In re Pers. Restraint of Stenson, 142 Wn.2d 710, 722, 16 P.3d 1 (2001) (Stenson II). A conflict over trial strategy or a defendant's lack of trust or confidence in his attorney does not warrant substitution of counsel. State v. Cross, 156 Wn.2d 580, 607, 132 P.3d 80 (2006). "Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense." Stenson I, 132 Wn.2d at 734.

The day before trial, Bogart asked to address the court about concerns he had with his representation. He complained that "there should have been more motions filed on [his] behalf." He told the court that he had asked Schwarz to file certain motions, but Schwarz decided not to do so because he thought they had

---

[5] Because Bogart contends there was no conflict of interest, we do not address that basis here.

little chance of success. Bogart said he thought LeMoigne should have been deposed a second time after they learned about Vorderstrasse's testimony, and he complained that he had not received a complete copy of discovery and what he had received had been heavily redacted. Bogart did not ask the court to appoint a different attorney to represent him.

Schwarz, in response, told the court that as far as he knew, there was only one document—a letter to Vorderstrasse dated less than a month earlier—that the State would not allow him to give to Bogart. Schwarz indicated that he had a copy of that letter with him and would, at the next break, allow Bogart to read it.[6] The court, in response to Bogart's concerns, stated:

> I appreciate you raising the concerns you have, but you are represented by counsel. Both attorneys in this case have an exemplary reputation in this jurisdiction for working not only hard but ethically within the courtrooms of this jurisdiction. There may be— there may be matters you'd like to know more about or that you have had some disagreement with your counsel about. All I can say is that from the perspective of this Court, both counsel have worked very hard to ensure that today's proceedings begin in a manner that is structured to fairly address the charges with which you have been arraigned . . . .

Stenson II is helpful to our analysis here. In that case, Stenson's trial attorney moved to withdraw due to frustrations with his client. 142 Wn.2d at 729. The attorney told the trial court that he felt he did not have an attorney-client relationship with Stenson and indicated that he was so upset that he could not

---

[6] The State informed the court that throughout the case, the prosecutor had worked cooperatively with Schwarz to redact discovery in a manner that complied with CrR 4.7. With regard to the Vorderstrasse letter, the prosecutor stated that he decided that no amount of redaction would be appropriate because of the number of threats Vorderstrasse, who was in custody, had received in relation to the case.

"'stand the sight of him.'" Id. The trial court denied this motion after finding that counsel was competent and that his representation was excellent. Id.

In a personal restraint petition, Stenson argued that his counsel should have withdrawn from representation. Id. at 721. Our Supreme Court disagreed and concluded that the effects of any breakdown in communication were negligible. Id. at 729. The court highlighted that while Stenson and his counsel had many disagreements, there was no evidence that the representation had been inadequate. Id. at 730. And there was no evidence that the breakdown in communication lasted long or was severe. Id. at 731. Thus, the court concluded that there was no reason to believe that an irreconcilable conflict existed. Id. at 732.

The issues identified here are less severe than those identified in Stenson II. Here, as in that case, the record does not demonstrate a complete collapse in Bogart's relationship with Schwarz or that the issues identified prevented him from fully presenting an adequate defense. Unlike in Stenson II, Bogart's comments to the trial court demonstrate that Bogart and Schwarz were communicating, albeit disagreeing, on how to move forward with the case and whether or not to conduct certain discovery or file certain motions. And the record demonstrates that Schwarz provided Bogart with all of the discovery, even if it occurred in a manner Bogart disliked. Like in Stenson II, Bogart's relationship with his counsel may have been strained but "[s]imple lack of rapport between attorney and client is not a basis for withdrawal of counsel, even where client and attorney agree withdrawal is preferred." State v. Hegge, 53 Wn. App. 345, 350, 766 P.2d 1127 (1989).

Finally, his bald assertion that defense counsel discussed his case with another inmate, without more, is not sufficient to warrant relief or to justify granting a reference hearing. See In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992) ("Bald assertions and conclusory allegations" do not support holding a reference hearing.).

Bogart has failed to demonstrate that his trial counsel would have been permitted to withdraw. And he has not otherwise demonstrated that Schwarz's behavior fell below an objective standard of reasonableness or resulted in inadequate legal assistance. Trial counsel was not deficient.

Plea Negotiations

Bogart next argues that his counsel was ineffective in the plea negotiation process because counsel failed to properly explain the terms of the State's plea offer. Again, this contention is not supported by the record.

The right to effective assistance of counsel applies in the plea bargaining context. Lafler v. Cooper, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). Counsel has a duty to assist a defendant in evaluating any plea offer that the defendant receives. State v. A.N.J., 168 Wn.2d 91, 111, 225 P.3d 956 (2010). Effective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial. Id. at 111. Counsel must, at a minimum, "reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty." Id. at 111-12.

According to comments Bogart made during his sentencing hearing, the State initially offered to allow Bogart to plead to charges that would result in a recommended sentence of 158 months, an offer Bogart admitted he rejected. Bogart then apparently changed his mind and wanted to accept the deal, but learned the State had withdrawn the offer. After a jury found him guilty, and Bogart realized he was facing a sentence of in excess of 400 months, he complained to the trial court about the State's decision to withdraw the offered plea:

> [T]hey offered me a plea for 158 months, and then they take it away like a week, you know? At first I said I didn't want it, but then I tell you all that I want that plea man. And then you say, no, no more plea, because that plea is gone, you know what I mean? And then that man want 270 months, and I'm not taking no 270-month plea, but I'll take 158-month plea. They take it away fast, man. I didn't say yes right away, you know? I have to think about it because the problem with a 158-month plea is [Schwarz] told me they give me 10 years. I'm like, 158 months didn't make ten years, so I try to tell [Schwarz] that when he told me the plea. You know, 158 months is not 10 years. 10 years is 120 months, you know? So they—[Schwarz] come back and he told me that 159 months means I would do ten years, I would serve the ten years, you know? But I was just trying to tell him that he was wrong, that 158 was not ten years.

Bogart now argues that his counsel failed to effectively communicate and explain the plea offer to him. Bogart further argues that defense counsel failed to explain to Bogart that he would face a much longer sentence if he rejected the offer.

But Bogart's statements during his sentencing hearing demonstrate that he was aware that the State had offered him a plea of 158 months and that he had rejected that offer. And aside from the remarks Bogart made during sentencing, there is no evidence in the record to suggest that Bogart did not understand the offer. He provided no testimony whatsoever about the plea negotiation process or

any representations his counsel made about the consequences of accepting or rejecting the offer. Nothing in the record suggests that Bogart was unaware that he faced a much longer sentence if he chose to reject the plea offer and go to trial.

Bogart has failed to demonstrate that his defense counsel's performance in the plea negotiation process was deficient.

Closing Argument

Next, Bogart contends that his counsel was ineffective during closing arguments because he "appear[ed] to be arguing for the State." But the excerpts from the argument on which he relies have been taken out of context and were an appropriate explanation of the law that applied to the case.

During closing argument, defense counsel used a flow chart to explain the jury instructions and applicable law. He addressed each question the jury had to answer and how it might approach the instructions and evidence to answer each question. For example, when assessing the assault charge, counsel argued

> [T]his is the question, did Mr. Bogart intend to inflict bodily injury upon Mr. LeMoigne? If you think he did not, if you think that shot was meant not to inflict bodily injury, he was not trying to hurt him, then you must find him not guilty, because there is no intent to inflict bodily injury. . . .
>
> If you decide that he did intend to inflict bodily harm, then you have to ask yourself self defense questions. . . . Do you believe that Mr. Bogart reasonably believed that Mr. LeMoigne was backing up his car toward him and that he was about to be injured?
>
> So if you believe that he did not believe that, that sounds a little odd to say, but if after looking at all the evidence the State has proven to you that he does not have that belief, you must find him guilty.

Schwarz continued to explain the law in this fashion, arguing that each instruction created a question the jury had to answer. Counsel explained that, based on how it answered each question, the jury would have to find Bogart guilty or not guilty.

Bogart highlights several passages of this lengthy closing argument and contends that Schwarz appears to be arguing for the State and encouraging the jury to find him guilty. This assertion takes defense counsel's closing argument out of context.

When considered in the context of argument as a whole, it is clear that Schwarz did not argue that the jury should find his client guilty, but merely explained the law governing their decision. Schwarz's closing argument was an accurate explanation of the law likely intended to further the jury's understanding of the jury instructions and to facilitate its deliberations. Furthermore, the totality of defense counsel's closing argument shows that Schwarz zealously encouraged the jury to acquit Bogart of first degree assault. After laying out the legal framework, Schwarz argued at length that the evidence precluded a finding of guilty. He argued that the evidence demonstrated Bogart's fear for his life and his lack of intention to inflict harm on LeMoigne and that, because of this, the jury should find him not guilty.

Because counsel merely explained the law to the jury before arguing that it should find Bogart not guilty, Bogart cannot show that his counsel's performance was deficient. Therefore, counsel was not ineffective.

Failure to Challenge Evidence

Finally, Bogart argues his trial counsel was ineffective for failing to challenge evidence of damage to LeMoigne's vehicle. He argues his counsel's performance was deficient because the evidence relating to the bullet damage to LeMoigne's car lacked proper foundation or was otherwise irrelevant.

Bogart first argues that the "entirety of th[e] line of testimony and evidence" regarding the firearm damage to LeMoigne's vehicle was irrelevant because there was no evidence to connect the mark on the car to any weapon Bogart possessed. He argues that evidence that the damage to LeMoigne's vehicle was caused by a bullet is only relevant if the State can connect the damage to Bogart's actions.

But the evidence of firearm damage was relevant to an element of the crime—whether Bogart used a firearm to assault LeMoigne with the intent to do great bodily harm. LeMoigne testified—and Bogart admitted—that Bogart fired several bullets at LeMoigne as he drove away. LeMoigne testified that the damage was not there prior to the assault. When police arrested Bogart later that day, he had two firearms—a shotgun and a .22 caliber revolver—and ammunition to use them in his vehicle. At trial, Bogart admitted that he used the revolver in the assault and contended that his use of the revolver, rather than the shotgun, demonstrated that he did not intend to hurt LeMoigne. The bullet damage demonstrates both that a firearm was used in the actual assault and that it was aimed at LeMoigne, supporting the State's position that Bogart intended to do harm. Because this evidence was relevant, it was not deficient for trial counsel not to challenge its admission.

In the same vein, Bogart challenges that the testimony of Deputy Steve Dosch,[7] regarding bullet damage to LeMoigne's car, arguing he lacked the requisite knowledge or expertise to opine that the mark on the car came from a bullet. Dosch, a retired Snohomish County Sheriff's Deputy with 24 years of experience, testified that he examined the car while interviewing LeMoigne regarding the shooting incident and LeMoigne showed him what he described as a bullet graze mark on the side of the car. He took photographs of the mark and testified that, although he had not had advanced forensic training, his common sense told him that it "appears that that [mark] could be consistent with a bullet strike grazing a car." He further opined that

> [I]t looks like the bullet would have—assuming it was a bullet, it looked like a shotgun of some sort came from the rear of the vehicle, hit the vehicle causing the dent and then skipping where you see the missing paint and just traveling forward toward the front of the car. That's what it appeared.

Counsel did not object to this testimony.

But the decision whether and when to object to trial testimony is a "classic example[] of trial tactics." State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). A reviewing court presumes that a "failure to object was the product of legitimate trial strategy or tactics." State v. Johnston, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007).

Bogart cannot demonstrate that the decision not to challenge Dosch's testimony was anything other than a considered trial tactic. LeMoigne testified

---

[7] In his petition, Bogart contends Deputy Lucas Robinson testified as to the bullet damage to LeMoigne's vehicle. However, the testimony that Bogart argues was inadmissible was given by Deputy Steve Dosch.

Bogart shot at him as he was driving away. The State called Greg Frank, a forensic scientist with the Washington State Patrol Crime Lab to confirm that the mark on LeMoigne's car most likely came from a bullet. He opined that "visually [the mark] is consistent with what I would have seen in other cases as a—from a ricochet on a vehicle, a bullet ricochet on a vehicle." Dosch's testimony was consistent with the testimony of Bogart, LeMoigne and Frank.

It is not only conceivable but highly probable that defense counsel strategically chose not to challenge Dosch's testimony that the mark on LeMoigne's car came from a bullet from Bogart's gun, given the defense theory that Bogart did in fact shoot at LeMoigne but did so in self-defense. Counsel likely decided that it would waste time and confuse the jury to challenge evidence from Dosch that was simply cumulative of that provided by other witnesses, or to challenge evidence that Bogart shot at LeMoigne when Bogart planned to admit he did so. Bogart has not demonstrated that the failure to object to Dosch's testimony constitutes ineffective assistance of counsel.

F.  Ineffective Assistance of Appellate Counsel

Bogart further asserts that he received ineffective assistance of counsel on appeal. We can identify no basis for this claim.

A criminal defendant has a right to have effective assistance of counsel on an appeal of right. In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 787, 100 P.3d 279 (2004) (citing Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985)). A petitioner must show that "'the legal issue that appellate counsel failed to raise had merit'" and that they were "'actually prejudiced by the appellate

counsel's failure to raise the issue.'" In re Pers. Restraint of Meredith, 191 Wn.2d 300, 308, 422 P.3d 458 (2018) (quoting Dalluge, 152 Wn.2d at 777-78). To establish prejudice, the petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to raise an issue, he would have prevailed on his appeal. Id.

Bogart has not established that the issues raised in this petition were meritorious or that he would have prevailed in reversing his conviction or sentence had they been advanced on direct appeal. He has not demonstrated any ineffective assistance of appellate counsel.

G. Cumulative Error

Finally, Bogart argues that the cumulative effect of the challenged errors deprived him of his right to a fair trial. The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Id. Because Bogart cannot show that multiple errors deprived him his right to fair trial, his cumulative error claim fails.

We deny Bogart's petition.

Andrus, A.C.J.

WE CONCUR:

- 27